1  **WO**

2

3

4

5

6

7              IN THE UNITED STATES DISTRICT COURT

8                FOR THE DISTRICT OF ARIZONA

9   Mark H. Goldberg; Sherry R. Goldberg; )        No. CV 05-2670-PHX-JAT
              et al.,                    )
10                                        )              **ORDER**
              Plaintiffs,                )
11                                        )
              vs.                        )
12                                        )
                                         )
13  Pacific Indemnity Company, a California )
          corporation; et al.,           )
14                                        )
              Defendants.                )
15

16

17      Pending before the Court are Defendant Federal Insurance Company's ("Federal")

18  Motion for Summary Judgment (Doc. #143) and Defendant Pacific Indemnity Company's

   ("Pacific") Motion for Summary Judgment (Doc. #144).   The Court now rules on the

19  motions.

20

      **I. FACTUAL BACKGROUND**
21
       In June of 2001, Mr. and Mrs. Goldberg purchased a 14,000 square foot home in
22
   Paradise Valley, Arizona for $5.7 million "as is."  The Goldbergs did remodeling work on
23
   the house shortly after its purchase.   They moved into the house in May of 2002 and
24
   continued their remodeling efforts.
25
       Effective June 7, 2001, Pacific issued an insurance policy to the Goldbergs for their
26
   new home.  Defendant Pacific referred to the Goldbergs' type of policy as the "Masterpiece
27
   Policy."  The Masterpiece Policy provides coverage against, "all risk of physical loss to your
28

1   house . . . , unless stated otherwise or an exclusion applies."  (DSOF ¶¶11-12, Doc. #146,
2   Attach. 1). The policy remained in effect at all relevant times.

3       In August 2002, the Goldbergs began to detect odors inside the house.  Toward the
4   end of that year, someone told the Goldbergs that employees of the remodeling contractor
5   may have urinated in various locations inside the house.  The Goldbergs then demanded that
6   the remodeling contractor take corrective action.  The Goldbergs did not at that time contact
7   Pacific.   The contractor's insurer hired AIR Resources in January of 2003 to perform
8   remediation services.    The Goldbergs claimed that urine odors remained after AIR
9   Resource's remediation efforts.

10      The Goldbergs notified Pacific of the alleged urine damage on or about July 16, 2003.
11  This notice came fourteen months after the Goldbergs first smelled odors in their house and
12  seven months after they made a claim against their contractor for remediation.
13  Notwithstanding a late notice provision in the Goldbergs' insurance policy, Pacific accepted
14  the claim.

15      Federal adjusted the claim on behalf of Pacific.  Federal sent an adjuster to the
16  Goldbergs' home shortly after the Goldbergs notified Pacific of the loss.  Federal retained
17  several consultants to investigate the Goldbergs' claim: Don Woods, a certified industrial
18  hygienist, and his assistant, Deanna Corbett, another hygienist, both of Certified Health &
19  Safety Consulting; Adel Assaf and Robert Hutzel, industrial hygienists; Harry Parrish, a
20  construction specialist; Hayden Baldwin, a forensic light source specialist; and Dr. Cain, an
21  expert on the olfactory system.  The Goldbergs also hired their own hygienic consultants.
22  During the course of the investigation, Pacific spent approximately $300,000 on remediation
23  work and paid the Goldbergs approximately $1,800,000 in Additional Living Expenses
24  ("ALE"), at the rate of $75,000 per month.

25      The Goldbergs claimed that urine odors permeated the house even after Federal's
26  additional remediation work.  The Goldbergs became convinced that further remediation
27  would not help and they wanted Pacific to raze and completely rebuild the house.  Federal

28                                      - 2 -

1    continued to investigate the reports of urine contamination, while also investigating other

2    potential sources for the reported odors.

3         Meanwhile, the Goldbergs sued their remodeling contractor and subcontractors in

4    state court.  Pacific initially joined in the suit with the Goldbergs.  When Pacific became

5    concerned that its litigation position and the Golderg's position were irreconcilable, Pacific

6    dropped out of the suit.

7         Ultimately, on January 20, 2005, after months of investigation by Federal, Defendants

8    advised the Goldbergs that Federal had completed the investigation of the urine claim and

9    that the investigation had not revealed any remaining physical evidence of urine

10   contamination.  (PCSOF Exh. 4, Doc. #151).  Pacific stated that it believed any urine

11   deposits from the contractors had been removed and remediated and/or had dissipated to the

12   point that the deposits could no longer be detected.  Pacific further stated that any continuing

13   odors in the house could not reasonably be attributed to the alleged urine deposits.  (Id.).

14   Pacific offered to pay for more construction and rebuild efforts, but refused to completely

15   raze and rebuild the house.  (Id.).

16        The Goldbergs filed this breach of contract and bad faith action against Pacific and

17   its adjuster Federal (collectively, the "Defendants") on July 29, 2005.  At some point after

18   the Goldbergs filed suit, Federal, on behalf of Pacific, offered to purchase the house at a price

19   determined by an independent appraiser determining the purchase price.  The Goldbergs

20   refused the offer.

21        **II. STANDARD**

22        Summary judgment is appropriate when "the pleadings, depositions, answers to

23   interrogatories, and admissions on file, together with affidavits, if any, show that there is no

24   genuine issue as to any material fact and that the moving party is entitled to summary

25   judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Thus, summary judgment is mandated,

26   "...against a party who fails to make a showing sufficient to establish the existence of an

27

28                                                    - 3 -

1  element essential to that party's case, and on which that party will bear the burden of proof

2  at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

3        Initially, the movant bears the burden of pointing out to the Court the basis for the

4  motion and the elements of the causes of action upon which the non-movant will be unable

5  to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-

6  movant to establish the existence of material fact. *Id.* The non-movant "must do more than

7  simply show that there is some metaphysical doubt as to the material facts" by "com[ing]

8  forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec.*

9  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P.

10  56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury

11  could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

12  242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create

13  a material issue of fact and defeat a motion for summary judgment. *Id.* at 247-48. However,

14  in the summary judgment context, the Court construes all disputed facts in the light most

15  favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir.

16  2004).

17        **III. FEDERAL'S MOTION FOR SUMMARY JUDGMENT**

18        Federal has moved for summary judgment on both of Plaintiffs' claims. Federal

19  argues that it is not liable on the breach of contract claim because it was not a party to the

20  insurance agreement. Further, Federal argues that it is not liable on the bad faith claim

21  because, as the adjuster, it did not owe a separate duty of good faith to Plaintiffs. Finally,

22  Federal argues that even if it did owe a duty to Plaintiffs, it did not act in bad faith while

23  adjusting Plaintiffs' claim.

24        Plaintiffs concede that Federal is not liable on the breach of contract claim because

25  Federal is not a party to the insuring agreement. (Plaintiffs' Amended Response in

26  Opposition, p. 11 (Doc. #485)). But Plaintiffs argue that Federal owed them a separate duty

27  of good faith. Plaintiffs contend that both Pacific and Federal are liable for bad faith.

28

In *Meineke v. GAB Business Services, Inc.*, 991 P.2d 267 (Ariz. Ct. App. 1999), the home insurance policy owners sued the private adjusters hired by the insurer to investigate the policy owners' fire loss claim.  The *Meineke* plaintiffs sued for breach of contract, bad faith, punitive damages, and negligence.  991 P.2d at 268.  The court granted the adjusters' motion for summary judgment on the breach of contract, bad faith, and punitive damages claims because no contract existed between the plaintiffs and the adjusters.  *Id*.  The Plaintiffs did not appeal from that ruling.  *Id*.

The court also granted summary judgment to the adjusters on the negligence claim because the Court held that the adjusters did not owe a duty to the plaintiffs.  The plaintiffs appealed from that judgment.  *Id*.  On appeal, the court concluded that "the relationship between adjuster and insured is sufficiently attenuated by the insurer's control over the adjuster to be an important factor that militates against imposing a further duty on the adjuster to the insured."  *Id*. at 270.  The court also stated that "[c]reating a separate duty from the adjuster to the insured would thrust the adjuster into what could be an irreconcilable conflict between such duty and the adjuster's contractual duty to follow the instruction of its client, the insurer."  *Id*. at 271.

Plaintiffs attempt, unsuccessfully, to distinguish or limit *Meineke*.  Federal does not owe any contractual duties to Plaintiffs because Federal is not a party to the insurance agreement.  Nor, per *Meineke*, did Federal owe Plaintiffs a separate tort duty in its adjustment of the claim.  *See also Walter v. Simmons*, 818 P.2d 214, 222 (Ariz. Ct. App. 1991) ("In this case, [the adjuster] was dismissed from the bad faith claim because he owed no contractual duty to act in good faith or deal fairly with [insured].").

The Court finds that Federal did not owe any contractual duties or a separate duty in tort to Plaintiffs.  The Court therefore grants Federal's Motion for Summary Judgment.  This ruling does not end the inquiry into Federal's handling of the claim, however, because Pacific remains liable for Federal's actions.  *Id*. at 223.

1

## IV. PACIFIC'S MOTION FOR SUMMARY JUDGMENT

2

### A. Bad Faith Claim

3    Pacific concedes that it remains liable on the bad faith claim for any tortious conduct

4 by Federal.  (Pacific's Motion for Summary Judgment, p. 1 n.1 (Doc. #144)).  The Court

5 therefore must analyze Federal's handling of the claim.  If Plaintiffs have created a genuine

6 issue of material fact regarding Federal's bad faith adjustment of the claim, then the Court

7 must deny Federal's motion on the bad faith claim.

8    Arizona courts acknowledge that, "in buying insurance an insured usually does not

9 seek to realize a commercial advantage but, instead, seeks protection and security from

10 economic catastrophe."  *Rawlings v. Apodaca*, 726 P.2d 565, 570 (Ariz. 1986) (internal

11 citations omitted).  One of the benefits that flows from a first-party insurance contract, "is

12 the insured's expectation that his insurance company will not wrongfully deprive him of the

13 very security for which he bargained or expose him to the catastrophe from which he sought

14 protection.  Conduct by the insurer which does destroy the security or impair the protection

15 purchased breaches the implied covenant of good faith and fair dealing implied in the

16 contract."  *Id*. at 571.

17    Although insurers do not owe fiduciary duties to their insureds, they do owe them

18 some duties of a fiduciary nature; including, the duties of equal consideration, fairness, and

19 honesty.  *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279 (Ariz. 2000).  Insurers

20 must play fairly with their insureds.  *Id*.  An insurer commits bad faith when it,

21 "'intentionally denies, fails to process or pay a claim without a reasonable basis.'"  *Id*.

22 (quoting *Noble v. Nat'l Am. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981)).

23    But if an insurance claim is fairly debatable, the insurer cannot be liable for acting in

24 bad faith for denying a claim.  *Lasma Corp. v. Monarch Ins. Co. of Ohio*, 764 P.2d 1118,

25 1122 (1988).  The relevant inquiry regarding an insured's handling of a claim, regardless of

26 whether the insurer eventually pays the claim, is whether, "there is sufficient evidence from

27 which reasonable jurors could conclude that in the investigation, evaluation, and processing

28

1    of the claim, the insurer acted unreasonably *and either knew or was conscious of the fact that*
2    *its conduct was*
3    *unreasonable.*" *Zilisch*, 995 P.2d at 280 (emphasis added).  Thus, a bad faith claim requires
4    proof of both objective and subjective unreasonableness.

5           Federal spent months and months and engaged numerous experts to investigate
6    Plaintiffs' claim.  Federal paid for remediation at the house and adopted a "when in doubt,
7    rip it out approach."  If Plaintiffs suspected certain building materials were contaminated,
8    then Federal removed them.  Federal removed and replaced an entire room.  Federal used
9    several methods to try to detect urine permeation, including sending samples to labs for
10   analysis.  Federal paid Plaintiffs $75,000 a month in alternate living expenses while it
11   completed its investigation and repair work.

12          After many months of investigation, Federal determined that no objective proof of
13   remaining urine damage that would lead to the odor permeation described by Plaintiffs
14   existed.  Nonetheless, Plaintiffs continued to report an overpowering odor of urine in the
15   house.  Plaintiffs demanded that Federal raze and rebuild the house from the foundation up.
16   Federal rejected that demand, continued to investigate the urine damage claim, and attempted
17   to find other causes for bad odors in the house.  Ultimately, Federal could not verify any
18   alternate causes for Plaintiffs' reports of foul odors.

19          Plaintiffs sued Defendants for Pacific's refusal to pay to raze and rebuild their home
20   or pay them stigma damages.  Plaintiffs allege that Federal acted unreasonably in
21   investigating the claim and in refusing to comply with their raze and rebuild or stigma
22   damages demand.  After Plaintiffs filed suit, Defendants offered to purchase the home at a
23   price determined by a neutral, third-party appraiser.  Plaintiffs declined the offer.

24          In their Amended Response in Opposition to Federal's Motion for Summary Judgment
25   (Doc. #485), Plaintiffs offer the following as evidence of bad faith:[1]

26

27          [1]Plaintiffs make other allegations in their Opposition, but those allegations are not
28   substantiated by record evidence.  Rather than cite to specific statements of fact in its

1   •     Federal did not use all the investigation methodologies proposed by one of its

2          consultants

3   •     Emails from Louise Vallee, an industrial hygienist of Defendants, that recommended

4          that Defendants not use canines or gas chromatography to investigate the claim

5          because these methods would tip the claim in favor of the Goldbergs

6   •     Federal ignored numerous subjective reports of urine odors in the house

7   •     Federal unreasonably investigated other potential sources of the odors in the house

8   •     Federal claimed that negative surface testing and air sample lab results established

9          that no objective evidence of urine odor sources existed, even though that was not

10         definitive proof; and

11  •     A May 10, 2007 email from counsel to one of the state court defendants to counsel

12         for another state court defendant that read,

13  
14  
15  
16  
17  

> I spoke with Bobby Sullivan [counsel for Defendants] yesterday. Now I understand why Paige wanted deadlines as soon as possible. Bobby is noticing depositions for all of their experts in the near future. Bobby and the California firm are taking and defending theses depositions. He is also noticing a number of fact witnesses. All of the depositions have to be completed before July 31, 2007. He is waiting to file his motions for summary judgment until the deadline to file such motions, which is August 1, 2007.

18  
19  
20  

> I think we should delay as much as possible. Also, we should give plaintiffs the most meaningless deposition designations and wait to drop the important ones later on down the road.

21  

22  response memorandum, Plaintiffs invite the Court to peruse over four hundred statements of

23  fact to find an issue to present to the jury. "As supported by Plaintiffs' CSOFs 1-428 and

24  Controverting Responses to Defendants joint Statement of Facts, a jury can conclude that, contrary to Defendants' assertions that they acted in good faith, they have . . . and engaged

25  in other unreasonable and outrageous conduct causing significant harm to the Goldbergs."

26  (Doc. #485, p. 5). This sort of invitation violates Local Rule of Civil Procedure 56.1(3), which reads, "Memoranda of law filed in support of or in opposition to a motion for

27  summary judgment, including reply memoranda, shall include citations to the specific paragraph in the statement of facts that supports factual assertions made in the memoranda."

28

The Court will address these contentions in order.  First, Federal used all but one of the investigative protocols that its expert recommended.  After research by more than one person, Federal determined that dogs, the one recommended protocol not used, would not elicit reliable, objective evidence of aged urine from an unspecified individual (DSOF 139-141).[2]  Plaintiffs' own hygienist, David Rueckert, testified that he did not recommend or support the use of canines to locate urine sources within the house.  (DSOF 142).  If even Plaintiffs' expert did not think dogs should be used, then how could Federal's decision not to use dogs be characterized as unreasonable?

Second, Plaintiffs have read some words into Ms. Vallee's emails that were not there.  Ms. Vallee never stated that the use of dogs or gas chromatography would tip the claims "in favor of the Goldbergs."  Instead, with regard to the use of canines for investigation, Ms. Vallee wrote, "I think the dog is redundant and will also tip the claim."  (Plaintiffs' Exhibit 28).  Regarding the use of gas chromatography, Ms. Vallee wrote, "There are no real standards or cutoff numbers for urine odor threshold. It is likely that some very low levels could be found based on history, which alone does not substantiate the odor claim, yet will document presence which may tip the scales position wise in a legal action."  (Plaintiffs' Exhibit 118).  In her uncontradicted testimony, Ms. Vallee explained that she did not mean that the tests would tip the scales in favor of the Goldbergs, but meant that she wanted only objective information for the investigation.  She did not want unreliable information that could cause controversy to develop on either side.  (D Supp. SOF ¶¶23-24).

---

[2]When asked why Federal decided not to use dogs, Rick Soleau testified:
> Because we became convinced that the dogs, use of a dog would not be an objective measurement of urine odors because dogs can smell one person's urine versus another's, they can be trained to detect a difference or identity of a particular individual's urine. But to be able to detect the presence of urine or not, we didn't believe in the end after analysis that a dog could do that anymore than he could determine the presence of a human being or not.

(DSOF 140).

As the Court stated earlier, Plaintiffs' own expert, David Rueckert agreed that dogs would not help to investigate Plaintiffs' claim. Mr. Rueckert testified:

> I know that dogs can be trained to track a lot of things. It's my understanding that the dogs would be keyed into a specific protein. So if you're going to have them track urine odor within the Goldberg residence, you'd have to have a sample of the original urine in that contaminated site for them to track that specific protein. . . . So I'm not sure that it would actually be germane for the Goldberg residence. I don't think that we have that kind of control over who urinated.

(Defendants' Exh. 7, p.583). Mr. Rueckert's testimony confirms Mr. Soleau's explanation for why Federal ultimately did not use canines to investigate the claim.

Similarly, Plaintiffs' experts testified that gas chromatography would not lead to a conclusive or reliable determination regarding the alleged existence of urine contamination. Mr. Rueckert testified that gas chromatography "was not appropriate for this type of molecule set up. I did extensive research looking for laboratories that do [gas chromatography]. And they laughed like you wouldn't believe that I wanted to have them do testing for urine." (Defendants' Exh. 7, pp. 584-85). Fred Regnier, Plaintiffs' chemistry expert, testified gas chromatography, while theoretically able to identify potential byproducts of degraded urine, would not differentiate between byproducts from urine and byproducts from a number of other alternative sources. (Defendants' Exhibit 63, pp. 119, 226, 127, 194-99, and 235). Again, how can Plaintiffs contend that Federal somehow acted unreasonably in failing to use gas chromatography when Plaintiffs' own experts doubted the reliability of such a test?

Third, Federal claims it considered the subjective complaints submitted by the Goldbergs, even though at the time the Goldbergs sent them, some of the reports were weeks old. The fact that Federal did not send someone over to the house immediately after Misti Van Emst either talked with or left a message for Ms. Mangold saying the house had urine odors does not tend to prove Federal ignored the complaints. In fact, the evidence demonstrates that Federal did take the complaints seriously. Federal made its expert Don Woods available on a 24 hour basis if the Plaintiffs noticed an odor in the house. Further,

1    after complaints that the smells worsened in wet weather, Federal recreated humid conditions

2    in the house to try to confirm the existence of contamination.

3         Ironically, Plaintiffs' fourth allegation tends to disprove their third allegation.  When

4    Plaintiffs continued to complain about the odors in the house and continued to demand that

5    Defendants raze and rebuild the home even though Federal had discovered no objective

6    evidence of continued urine contamination, Federal attempted to find other potential sources

7    for the odors.  Federal's continued attempts to find a source for the reported odors

8    demonstrate that it did not ignore Plaintiffs' complaints.

9         Plaintiffs seem to suggest that Federal undertook these measures even though it knew

10   that no alternate source for the odors existed.  Why would Federal use its own money to pay

11   for testing that it thought was pointless?  Federal had legitimate reason to believe that some

12   other source for the odors might exist.  Federal had reports of green algae on top of mud in

13   the main air duct beneath the Goldbergs' residence, and numerous people had reported sewer

14   gas in the house.  Rather than demonstrating unreasonableness, Federal's investigation into

15   alternative sources of the bad odors evidences its effort to responsibly conduct a full and

16   thorough investigation of the insurance claim.

17        Fifth, Plaintiffs claim Federal unreasonably relied on its surface and air quality tests

18   to determine that urine contamination, to the extent it ever existed, no longer existed after

19   Federal's remediation attempts.  Plaintiffs argue that Federal could not rely on those test

20   results because humans can smell urine odors at a threshold lower than tests can detect.

21   Federal structured its investigation of the claim based on the reports submitted by Plaintiffs.

22   The Goldbergs submitted numerous reports of inhabitants and visitors to the house having

23   severe physical reactions to the odors, which Federal took at face value.  The experts in the

24   case agree that the huge concentration of degraded urine molecules needed to cause a

25   physical reaction in a person would be detectable with the testing methods used by Federal.

26   Federal's reliance on the tests under these circumstances is understandable.

27        Plaintiffs have not produced any post-remediation test results indicating urine

28   contamination in the home.  Are Plaintiffs suggesting that a reasonable insurer would have

razed and rebuilt from the ground up a 14,000 square foot home based solely on subjective complaints without any objective proof of remaining urine contamination, even after extensive testing?  If so, Plaintiffs' own claims handling expert would disagree.  Mr. Corridan testified that reports of odors alone would not require Defendants to accede to Plaintiffs' raze and rebuild demand.  (Defendants' Exh. 31 at pp. 89-91).

Finally, Plaintiffs' allegation regarding the email from counsel for defendants in the state court action is suspect.  The email is not relevant to this case.  The email was not carbon copied to counsel here.  Nor, as Plaintiffs suggest, does the email in any way implicate defense counsel in this case in a wrongful scheme with defense counsel in the state case.

The Goldbergs presented Pacific with a unique claim.  Neither party has cited a case from any Court in the country, federal or state, involving urine contamination so severe that it required the razing and rebuilding of an entire house – let alone a 14,000 square foot house.  In addition to being unique, Plaintiffs' claim was untimely.  The Goldbergs did not present the claim to Pacific until fourteen months after they first began smelling urine in the house and seven months after the Goldbergs made a claim against their contractor for remediation.  Nonetheless, Defendants engaged in an extensive and expensive investigation of the claim.

Federal assigned qualified and increasingly senior claims adjusters to the claim, including, eventually, a Senior Vice President (Eric Krantz).  Federal hired many technical consultants to investigate the claim; including: Don Woods, a certified industrial hygienist, and his assistant, Deanna Corbett; Adel Assaf and Robert Hutzel, industrial hygienists; Harry Parrish, a construction specialist; Hayden Baldwin, a forensic light source specialist; and Dr. Cain, an expert on the olfactory system and smells.  Plaintiffs do not dispute that Federal retained qualified consultants.

Federal performed approximately $300,000 of remediation work at the house.  It adopted an "if in doubt, rip it out" approach.  Under this approach, Federal agreed to tear out and replace anything that the Goldbergs thought might be urine contaminated.  It authorized the remediation of areas that already had been removed and rebuilt.  Federal also removed

1    massive amounts of drywall and wood studs, which required extensive opening of wall

2    cavities.  It even removed an entire room of the house.

3        During Federal's remediation and repair work at the house, Federal paid for the

4    Goldbergs to relocate and gave them $ 75,000 *a month* in additional living expenses.  The

5    $75,000 a month did not include the $1000 a month that Federal paid for drapery storage or

6    the money Federal paid for an apartment for the Goldbergs' daughter.  Even Plaintiffs'

7    experts agreed that this payment of additional living expenses was one of the most generous

8    packages they had ever encountered.

9        Federal considered, developed, and used a variety of methods to investigate whether

10   the house was contaminated by urine.  Federal tailored its investigation to address the

11   Plaintiffs' reports of numerous physical reactions to the malodors in the house.  Federal

12   conducted physical testing, including air- and wipe-sampling.  It sent the samples to

13   Serological Laboratories for analysis.  Of the over 100 samples sent by Federal to the lab,

14   none tested positive for urine, other than two samples intentionally spiked as controls.[3]

15       Federal hired one of the nation's foremost experts in forensic light source

16   examinations, Hayden Baldwin, to conduct a multi-day investigation of the home.  Mr.

17   Baldwin covered virtually every inch of the attic and living space.  He determined that the

18   stains identified by Mr. Rueckert as potential urine stains likely were not the product of

19   urine.

20       Federal also attempted to recreate the conditions that the Goldbergs claimed caused

21   the worst odors.  Federal elevated the level of humidity in the house and/or the temperature.

22   Despite these efforts, Federal could not verify the reported odors.

23       Federal's efforts extended to bringing odor panels to the house to provide objective

24   feedback on any odors in the house.  These panels could not verify the claim.  Federal did

25   not stop there.  It sent physical samples of allegedly contaminated materials to a remote entity

26

27       [3]Plaintiffs sent samples to the same lab.  Plaintiffs' earlier samples had one weak
     positive on building materials and another positive from a liquid sample, which came from
28   a bottle that undisputedly was never deposited into the house.

1   that used objective odor panels of screened individuals with good olfactory systems.  Again,

2   the odor panels' results were not consistent with the Goldbergs' claim of continued urine

3   odors.

4          When its lengthy and varied investigation did not verify the presence of urine

5   contamination, Federal tried to find other possible sources for the reported odors.  It tested

6   for sewer gas, plumbing leaks, underground air-return conditions, elevated slab moisture, and

7   mold.  None of these tests revealed a potential source of the extreme odors reported by

8   Plaintiffs.

9          Ultimately, after considering the Goldbergs' reports of severe, physical-reaction-

10   inducing urine odors throughout the house, contrasted with the lack of any objective evidence

11   of post-remediation urine contamination, Defendants refused Plaintiffs' raze and rebuild

12   demand.  Plaintiffs subsequently filed this suit.  Even after Plaintiffs filed this case, Federal

13   offered to open up additional walls to verify that urine did not exist behind them.  Federal

14   asked Plaintiffs to identify a sampling of locations and the protocol, then Defendants would

15   open the walls in those areas.  Plaintiffs did not respond to this offer.   Finally, in an attempt

16   to settle the claim, Federal, on behalf of Pacific, offered to purchase the house at a price

17   determined by an independent appraisal process.  The Goldbergs refused this offer.

18          If an insurance claim is fairly debatable, the insurer cannot be liable for acting in bad

19   faith for denying the claim.  *Lasma Corp.*, 764 P.2d at 1122.  While sometimes an issue of

20   fact, at other times, the issue of fair debatability is not a question appropriate for

21   determination by the jury. *Golden Rule Ins. Co. v. Montgomery*, 435 F.Supp.2d 980, 995 (D.

22   Ariz. 2006); *Lake Havasu Comty. Hosp.*, 687 P.2d 371, 381 (Ariz. Ct. App. 1984)(overruled

23   on other grounds by *Barmat v. John and Jane Doe Partners A-D*, 747 P.2d 1218, 1223 (Ariz.

24   1987)).  The evidence in this case leaves no conclusion but that the Goldbergs' raze and

25   rebuild claim was fairly debatable.  Federal conducted a lengthy and thorough investigation

26   of the claim, but did not uncover any objective proof of continued urine permeation after

27   Federal's remediation and rebuild efforts.  The Goldbergs have offered no such objective

28   proof.  Nor have the Goldbergs cited to any case in which a court awarded a raze and rebuild

remedy for degraded urine permeation. No reasonable juror could find that the Goldberg's entitlement to their requested remedy, above and beyond the over $1.8 million worth of benefits paid under the policy, was not at least "fairly debatable."

To hold an insurer liable for bad faith for its investigation of a claim, regardless of whether the insurer ultimately paid or denied the claim, a jury must find both: 1) that the insurer acted unreasonably in investigating, evaluating, and processing the claim and 2) that the insurer knew or was conscious of the fact that its conduct was unreasonable. *Zilisch*, 995 P.2d at 280.  Given the extensive and expensive nature of Federal's investigation of the claim, its payment of extremely generous benefits to the Goldbergs ($1.8 million dollars), and its efforts to settle the claim, a jury would be extremely hard pressed to find that Federal acted unreasonably in investigating the Goldbergs' claim.  What is even more clear, however, is that no reasonable juror could find that Federal *knowingly* acted in an unreasonable manner.

Plaintiffs obviously disagree with the ultimate conclusion of Federal's investigation. But Plaintiffs' disappointment with Federal's refusal to raze and rebuild their home does not mean that Federal acted unreasonably in adjusting the claim or in its ultimate refusal to comply with the raze and rebuild demand.  The Court will grant summary judgment to Pacific on Plaintiffs' bad faith claim and claim for punitive damages.[4]

**B. Breach of Contract Claim**

Pacific offers three defenses to Plaintiffs' breach of contract claim: late notice of claim; Plaintiffs' bad faith/failure to cooperate; and no stigma damages available under the contract.

**1. Late Notice**

Pacific argues that by waiting multiple months to report the odor problem, the Plaintiffs violated their contractual obligation to immediately report the alleged loss and to

---

[4]The only claim for which punitive damages are available is the bad faith claim. Plaintiffs cannot recover punitive damages on a breach of contract theory.

1   prevent the house from further damage.  Pacific maintains that Plaintiffs' failure to timely

2   notify prejudiced Pacific because, in the intervening months, Air Resources took actions that

3   made further investigation of the claim difficult.

4          Plaintiffs' insurance agreement with Pacific contains a notice clause that reads,

5   "**Notification.**   You must immediately notify us or your agent of your loss."   Such

6   notification clauses are enforceable, but the insurance company cannot refuse to pay a claim

7   for failure to notify unless the insurer can show that it has been prejudiced thereby.  *Lindus*

8   *v. N. Ins. Co. of New York*, 438 P.2d 311, 315 (Ariz. 1968).  The insurance company has the

9   burden of proving prejudice.  *Id*.  Further, even where prejudice may exist, the insurer can

10  waive the notification requirement.  *Zuckerman v. Transamerica Ins. Co.*, 650 P.2d 441, 444

11  (Ariz. 1982).

12         Pacific has made some showing of prejudice from Plaintiffs' failure to promptly notify

13  it of the alleged loss.  Air Resources performed remediation services on the house before

14  Pacific knew of the claim.  Air Resources removed allegedly contaminated insulation and did

15  not preserve it.  Air Resource's actions reportedly caused dust and insulation to travel from

16  the attic into the wall cavities, thereby spreading the purported contamination and odors

17  throughout the entire house.  According to Pacific, Plaintiffs' delay in reporting the problem

18  allowed any possible urine in the house to degrade, making it more difficult to detect.

19         Pacific concedes that whether it has suffered prejudiced from Plaintiffs' failure to

20  immediately notify it of the problem would normally be a fact question.  Pacific argues,

21  however, that the facts of this case leave no room for doubt.  The Court does not necessarily

22  agree that Pacific was prejudiced as a matter of law.  But the Court  need not decide the issue

23  because the Court finds that Pacific waived the notification requirement.

24         Waiver is a "'voluntary and intentional relinquishment of a known right . . . .'"

25  *Services Holding Co. v. Transamerica Occidental Life Ins. Co.*, 883 P.2d 435, 443

26  (1994)(quoting *Waughn v. Lennard*, 211 P.2d 806, 812 (Ariz. 1949)).  Proof of waiver

27  requires a clear showing of an intent to waive a right, but waiver may be inferred from

28  conduct.  *Id*.  Defendants knew that Plaintiffs had failed to immediately notify them of

Plaintiffs' alleged loss.  Nonetheless, Defendants paid over a million dollars of benefits to Plaintiffs under the policy.  Federal even touts this payment of benefits despite late notice as evidence of Federal's good faith adjustment.

Pacific argues that, pursuant to A.R.S. §20-1130, an insurer's decision to investigate a claim despite late notice of the claim does not waive the defense of lack of notification. The section cited by Pacific reads:

> Administration of claim against insurer not deemed waiver of defense
> Without limitation of any right or defense of an insurer otherwise, none of the following acts by or on behalf of an insurer shall be deemed to constitute a waiver of any provision of a policy or of any defense of the insurer thereunder:
> . . . 3. Investigating any loss or claim under any policy or engaging in negotiations looking toward a possible settlement of any such loss or claim.

A.R.S. §20-1130.

The Arizona statute addresses non-waiver of a defense for simply investigating a claim, but it says nothing about paying benefits on a claim.

Defendants paid for remediation at Plaintiffs' home.  Defendants further paid over a million dollars to Plaintiffs under the policy in ALE benefits.  Defendants have highlighted their investigation and payment of benefits on the claim as evidence of good faith.  Under these circumstances, the Court finds that Pacific waived any defense regarding the late notice of the claim.

## 2. Failure to Cooperate

The discussion above applies equally to Pacific's failure to cooperate defense. Pacific, by its own admission, is not advocating some sort of an insured bad faith tort theory. Nor has Pacific counterclaimed for breach of contract.  Instead, Pacific argues that Plaintiffs had a contractual obligation to cooperate with Defendants, which they failed to do; and, as a result, Pacific should not be liable on the insurance claim.  First, the Court cannot find as a matter of law that Plaintiffs failed to cooperate with Defendants during the investigation of the claim.  Second, as with the late notice claim, Pacific has waived the failure to cooperate defense by paying out more than a million dollars on Plaintiffs' claim.

1

### 3. Stigma Damages

2      Plaintiffs' Policy's Insuring Agreement provides the basic grant of coverage.  The

3  Policy insures against "all risk of physical loss to the insured's house unless stated otherwise

4  or an exclusion applies."  (DSOF ¶¶11-14, Doc. #146).  The first page of the Coverage

5  Summary of the Policy provides, "Your policy provides coverage against physical loss if

6  your home or its contents are damaged, destroyed, or lost.  The kinds of losses that are

7  covered and any special limits that apply, are explained in detail in the policy."  (Id.).

8      Pacific argues that the plain, unambiguous language of the insuring provision clearly

9  limits coverage to physical loss to the home; that the Policy does not cover economic loss,

10  such as the stigma damages Plaintiffs seek.  Plaintiffs argue that the Court must consider

11  more than the language of the insuring clause.  Plaintiffs contend that they purchased such

12  a deluxe, broad coverage Policy, that all damages to the house, purely economic or physical,

13  are covered.  Plaintiffs maintain that the Policy covers any loss of value to the home

14  associated with the stigma caused by the urine contamination.

15      Plaintiffs urge the Court to look beyond the Policy language in interpreting the

16  coverage provision and to consider extrinsic evidence.  Plaintiffs cite *Taylor v. State Farm*

17  *Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1138-39 (Ariz. 1993) for the proposition that the Court

18  can consider extrinsic evidence without first determining if the language in dispute is

19  ambiguous.  The *Taylor* court stated:

> [T]he ambiguity determination distracts the court from its primary objective-to enforce the contract as intended by the parties. Consequently, although relevant, contract ambiguity is not the only linchpin of a court's decision to admit parol evidence.  The better rule is that the judge first considers the offered evidence and, if he or she finds that the contract language is "reasonably susceptible" to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties. *See* RESTATEMENT § 215 cmt. b; *see also Pacific Gas & Elec. Co. v. G.W. Thomas Dray. & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 564, 566, 567-68, 442 P.2d 641, 644, 645-46 (1968); *cf. Melson*, 135 Ariz. at 121, 659 P.2d at 1266 ("A contract should be read in light of the parties' intentions as reflected by their language and in view of all the circumstances.").  The meaning that appears plain and unambiguous on the first reading of a document may not appear

nearly so plain once the judge considers the evidence. In such a case, the parol evidence rule is not violated because the evidence is not being offered to contradict or vary the meaning of the agreement. To the contrary, it is being offered to explain what the parties truly may have intended. We believe that this rule embodies the concepts endorsed by Corbin and adopted by this court ten years ago in *Melson*. Other courts more recently have expressed approval of the position taken by Corbin and the Restatement (Second) of Contracts. *See, e.g.*, *C.R. Anthony Co. v. Loretto Mall Partners*, 817 P.2d 238, 241-44 & n. 3 (N.M.1991); *Isbrandtsen v. North Branch Corp.*, 150 Vt. 575, 556 A.2d 81, 83-85 (1988); *Berg v. Hudesman*, 115 Wash.2d 657, 801 P.2d 222, 227-30 (1990); *see also* 3 CORBIN § 542, at 105-112 (Supp.1992) (citing cases).

854 P.2d at 1140 - 1141.

Even considering the extrinsic evidence put forth by Plaintiffs –Pacific's insurance manuals, testimony of Pacific's representatives, and expert testimony, the Court agrees with Pacific. The plain language of the provision in question and the remainder of the Policy clearly limit coverage to physical loss to the home. Neither the testimony highlighted by Plaintiffs nor Defendants' insurance manuals modify that meaning. Purely economic loss, like stigma damages, does not fall under the meaning of "physical loss."

The Court therefore holds that Plaintiffs' Policy does not provide coverage for any loss in market value of the house caused by stigma damages. But this holding does not mandate summary judgment in Pacific's favor on the contract claim. Plaintiffs have asked for damages for the physical loss to the home caused by urine contamination. This claim for damages qualifies as a physical loss. Plaintiffs can proceed on this claim for damages, but cannot recover "stigma" damages.

Although the Court has held that Federal did not act in bad faith in adjusting the claim and refusing to raze and rebuild Plaintiffs' home, the Court cannot find as a matter of law that Pacific did not breach the insurance agreement by refusing to raze and rebuild the house. Whether Pacific breached the insurance agreement by failing to raze and rebuild the home remains an issue of fact for the jury. Plaintiffs can pursue their breach of contract theory, but can recover damages only for any physical loss to the home.

Accordingly,

1    IT IS ORDERED GRANTING Defendant Federal Insurance Company's Motion for

2    Summary Judgment (Doc. #143).

3    IT IS FURTHER ORDERED GRANTING IN PART AND DENYING IN PART

4    Defendant Pacific Indemnity Company's Motion for Summary Judgment (Doc. #144).  The

5    Court grants summary judgment to Pacific on the bad faith claim, Count II of Plaintiffs'

6    Complaint.  The Court further grants summary judgment to Pacific on the stigma damages

7    issue of the breach of contract claim, but denies summary judgment as to all remaining issues

8    of Count I.

9    DATED this 20th day of February, 2008.

10

11

12

13

14

15

16

17                                    _____

                                     James A. Teilborg
18                                   United States District Judge

19

20

21

22

23

24

25

26

27

28